**GREENBERG TRAURIG, LLP**
VALERIE W. HO (SBN 200505)
1840 Century Park East, Suite 1900
Los Angeles, California 90067
Tel: (310) 586-7700
Fax: (310) 586-7800
E-mail:     hov@gtlaw.com

SCOTT J. BORNSTEIN (*pro hac vice*)
RICHARD C. PETTUS (*pro hac vice*)
200 Park Avenue
New York, New York 10166
Tel: (212) 801-9200
Fax: (212) 801-6400
E-mail:     bornsteins@gtlaw.com
                pettusr@gtlaw.com

Attorneys for Defendant and Counterclaimant
B. BRAUN MEDICAL INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| CAREFUSION 303, INC.,<br><br>      Plaintiff and Counter-defendant,<br><br>vs.<br><br>B. BRAUN MEDICAL INC.,<br><br>      Defendant and Counterclaimant. | CASE NO.  CV 11-01264 PA (ANx)<br><br>**Honorable Percy Anderson**<br><br>**REDACTED B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**<br><br>Discovery Cutoff:      June 25, 2012<br>Final Pretrial Conference: July 20, 2012<br>Trial Date:      September 18, 2012 |

# TABLE OF CONTENTS

Page

I. THE ALLEGED "INVENTIONS" OF THE PATENTS-IN-SUIT ................... 1

    A. The '418 Patent ......................................................................... 1

    B. The '816 Patent ......................................................................... 2

II. ADDITIONAL RELEVANT LEGAL PRINCIPLES ......................................... 3

    A. Claim Construction ................................................................ 3

    B. Indefiniteness ......................................................................... 4

III. ARGUMENT ......................................................................................... 5

    A. Most Significant" Disputed Claim Constructions of the '418 Patent...... 5

        1. *Plug* is a *member* moveable between an open and closed position 5

        2. *minimum* displacement of fluid and *minimum* fluid displacement 6

        3. *relatively small* movement of fluid ......................................... 8

        4. internal chamber .......................................................... 10

        5. "substantially compensates ... for a zero displacement" ............ 11

    B. "Most Significant" Disputed Claim Constructions of the '816 Patent.. 13

        1. valve element ... displaced *off-axis* ... to form a fluid channel ... 13

        2. second axis ... displaced ... to form/open a fluid channel ............ 14

        3. fluid channel being non-concentric with the axis of the housing"16

        4. "fluid flow path is displaced from the axis of the housing" ......... 16

        5. open the channel substantially along only one side of the housing .......................................................................... 17

    C. Other Disputed Claim Constructions of the '418 Patent ...................... 18

        1. biased member/plug...moved ... into a portion of the air chamber .......................................................................... 18

- i -

LA 130,338,221v1

|  |  | 2. | "generally planar" | 20 |
|  |  | 3. | "non-perpendicular relationship" and "slanted relationship" | 21 |
|  | D. | Other Disputed Claim Constructions of the '816 Patent | | 23 |
|  |  | 1. | shaft | 23 |
|  | E. | The Preambles of the '418 Patent Only Are Properly Limiting | | 24 |
|  |  | 1. | The '816 patent preambles are not limiting | 24 |
|  |  | 2. | The '418 patent preambles are limiting | 25 |
| CONCLUSION | | | | 25 |

LA 130,338,221v1

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

**Federal Cases**

4

*Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*
   674 F.3d 1365 (Fed. Cir. 2012) ............................................... 11

5

*Application of Hutchinson*

6

   154 F.2d 135 (C.C.P.A. 1946) ................................................. 24

7

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*
   672 F.3d 1335 (Fed. Cir. 2012) ............................................... 24

8

9

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*
   402 U.S. 313, 91 S.Ct. 1434, 28 L. Ed. 2d 788 (1971) ............ 7

10

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.*

11

   289 F.3d 801 (Fed. Cir. 2002) ........................................... 24, 25

12

*Chimie v. PPG Indus. Inc.*
   402 F.3d 1371 (Fed. Cir. 2005) ......................................... 14, 25

13

*Curtiss-Wright Flow Control Corp. v. Z & J Techs. GmbH*

14

   563 F. Supp. 2d 1109 (C.D. Cal. 2007) .............................. 10, 25

15

*Datamize, LLC v. Plumtree Software, Inc.*
   417 F.3d 1342 (Fed. Cir. 2005) ....................................... passim

16

*Finjian, Inc. v. Secure Computing Corp.*

17

   626 F.3d 1197 (Fed. Cir. 2010) ............................................... 3

18

*Funai Elec. Co. v. Daewoo Elecs. Corp.*
   616 F.3d 1357 (Fed. Cir. 2010) ............................................. 13

19

20

*Halliburton Energy Servs., Inc. v. M-I LLC*
   514 F.3d 1244 (Fed. Cir. 2008) ........................................ 4, 6, 9

21

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*

22

   2007 WL 6137003 (C.D. Cal. Apr. 16, 2007) .......................... 7

23

*In re Freeman*
   30 F.3d 1459 (Fed. Cir. 1994) ............................................... 10

24

25

*Int'l Gamco, Inc. v. Multimedia Games, Inc.*
   732 F. Supp. 2d 1082 (S.D. Cal. 2010) ............................. 10, 25

26

*Loctite Corp. v. Ultraseal Ltd.*

27

   781 F.2d 861 (Fed. Cir. 1985) ............................................... 24

28

- iii -

*Markman v. Westview Instruments, Inc.*
  52 F.3d 967 (Fed. Cir. 1995) ......................................................................... 3

*Merck & Co. v. Teva Pharms. USA, Inc.*
  395 F.3d 1364 (Fed. Cir. 2005) ............................................................ 18, 19

*Nobelpharma AB v. Implant Innovations, Inc.*
  141 F.3d 1059 (Fed. Cir. 1998) ................................................................ 24

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*
  521 F.3d 1351 (Fed. Cir. 2008) ....................................................... passim

*Omega Eng'g, Inc. v. Raytek Corp.*
  334 F.3d 1314 (Fed. Cir. 2003) ............................................................ 4, 19

*Phillips v. AWH Corp.*
  415 F.3d 1303 (Fed. Cir. 2005) ..................................................... 4, 14, 24

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*
  442 F.3d 741 (9th Cir. 2006) ...................................................................... 10

*Tandon Corp. v. Int'l Trade Comm'n*
  831 F.2d 1017 (Fed. Cir. 1987) ................................................................ 11

*Telecordia Techs., Inc. v. Cisco Sys., Inc.*
  612 F.3d 1368 (Fed. Cir. 2010) .................................................................. 6

*United Carbon Co. v. Binney & Smith Co.*
  317 U.S. 228 (1942)........................................................................................ 9

**Federal Statutes**

35 U.S.C. § 112 ....................................................................................... 4, 6

**Federal Rules**

Federal Rules of Civil Procedure, Rule 11 .............................. 1, 2, 7, 8

Federal Rules of Civil Procedure, Rule 30(b)(6) ............................... 7

LA 130,338,221v1

Defendant B. Braun Medical Inc. ("B. Braun") responds here to the handful of proposed claim constructions that Plaintiff ("CareFusion 303") provides in its opening brief, as well as to the remainder of the "disputed" claim terms that Plaintiff has steadfastly *refused to construe* other than by asserting that some undefined "plain and ordinary" meaning should apply, without telling B. Braun or this Court what it contends that meaning is to a hypothetical person of ordinary skill in the art.

Plaintiff's tactically evasive "plain and ordinary" meaning assertion is tantamount to providing no construction at all (as B. Braun has told Plaintiff throughout this case, including during the claim construction "meet-and-confer"). Accordingly, having had its chance to provide actual constructions in its opening brief (and prior Court-ordered Infringement Contentions) and deciding not to do so, Plaintiff should be precluded from proposing a construction in its Reply or otherwise, per this Court's clear directives. (*See* Dkt. 180 ("The Court will not entertain new constructions proposed for the first time in reply briefs or other filings which do not afford the opposing party an opportunity to respond.")

With respect to the disputed terms for which Plaintiff actually proposed a meaning, its constructions are intentionally divorced from the context of the alleged inventions, the language of the patent claims, the disclosures of the patent specifications and/or their respective file histories and, in many instances, are contradicted by or disclaimed in them. The record is also clear that Plaintiff's constructions run counter to the manner in which Plaintiff applied those same claim terms to the Accused Products in its pre-suit Rule 11 analysis and its Infringement Contentions. (Dkt. 46).

In contrast, B. Braun's claim constructions conform to the record, and the controlling legal authorities, and Defendant respectfully requests that they be adopted.

## I.   THE ALLEGED "INVENTIONS" OF THE PATENTS-IN-SUIT

### A.   The '418 Patent

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

LA 130,338,221v1

In its opening brief, Plaintiff contends that the alleged invention of the '418 patent (Exs. 1, 2)[1] is so-called "positive displacement" of fluid upon closing of the valve -- i.e., the expelling of fluid from inside of the valve through the outlet port (as opposed to "negative" displacement, or pulling of fluid into the valve upon its closing, or "zero/neutral" displacement where no fluid moves in or out of the valve upon closing.)[2]

Contrary to the constructions it now proposes, in its pre-suit Rule 11 investigations which Plaintiff "represented under oath" (Dkt. 87, Sanctions Order, at 5) to Magistrate Nakazato had confirmed that each of the "disputed" claim terms was met by the Accused Products, Plaintiff merely eye-balled the valves to see if *any amount of positive displacement* occurred upon valve closing, and if it did, concluded that the claim terms were met without any further testing or evaluation of whether that amount of displacement was "relatively small" or "minimum". (See Dkt. 87 ("Given CF's sworn representation that it completed its infringement analyses ant testing more than seven months ago..."); Ex. 5, Mansour Tr. 115-118.)    Similarly, in its Infringement Contentions, Plaintiff did not apply the constructions that it now proposes should be adopted by the Court.

**B.    The '816 Patent**

Without clearly identifying any particular invention of the '816 patent (Ex. 5), Plaintiff points out that valves with flat proximal/top surfaces can be swabbed clean. But this was very well known to persons of ordinary skill in the art at the time, and thus, it cannot be the inventive feature. (*See, e.g.*, Ex. 6, Fig. 1; col. 3, ll. 57-60; col. 8, ll. 8-13 ("proximal end ... is substantially flat .... [so that it] can be swabbed"); Ex. 7, Fig. 2; col. 8, ll. 52-56 ("smooth and flush surface"); Ex. 8, Figs. 1 and 5; col. 4, ll. 18-28 ("proximal

---

[1] Unless otherwise noted, all exhibits referenced herein are attached to the Declaration of Justin A. MacLean ("MacLean Decl."), filed concurrently herewith.
[2] This alleged "positive displacement" invention of the '418 was anticipated by B. Braun's prior discovery and development of valves that provided this feature years earlier. (*See* Dkt. 152.)

2

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

end of the connector, [is] flush .... To be easily wiped").)[3]  If there is anything unique (there is not), it could only be the specific *way* in which, per the patent, the fluid channel of the valve is opened, i.e., by the top/proximal surface tilting at an angle during opening (versus the opening of a slit or the like) as the entire valve element displaces off-axis from the housing, thereby resulting in a non-concentric fluid flow path down only one side of the valve. (*See, e.g.*, Ex. 5, Figs. 3, 5, 11.)  No other way to accomplish fluid flow is disclosed or taught to be part of the alleged invention.

## II.   ADDITIONAL RELEVANT LEGAL PRINCIPLES

### A.   Claim Construction

Claim construction is an issue of law for the Court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 391 (1996). This means that "[w]hen the parties raise an actual dispute regarding the proper scope of [the] claims, the court, not the jury, must resolve that dispute."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  Plaintiff's tactical approach of repeatedly stating that the "plain and ordinary" meaning should apply to a disputed claim term -- without disclosing what they contend that meaning to be -- is improper, particularly in this case, "when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* at 1361.  Here, the parties have "fundamental dispute[s] regarding the scope" of many claim terms, and thus, "it is the court's duty to resolve [them]."  *Id.* at 1362-63.[4]

While the words of a claim "are generally given their ordinary and customary meaning," what is meant by that is "the meaning that the term would have to *a person of ordinary skill in the art* in question at the time of the invention, i.e., as of the effective

---

[3] Notably, Plaintiff's expert, Mr. Leinsing, is a named inventor on the last two of these prior art patents both of which clearly show that flat, swabbable, proximal valve ends were well known in the art and clearly not an inventive feature of the '816 patent.

[4] The cases Plaintiff cites for this proposition did not present "actual dispute[s]" regarding claim scope but were merely "[r]estating a previously settled argument." *See, e.g., Finjian, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206-07 (Fed. Cir. 2010).

3

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*) (emphasis added). Such a person of skill "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* "Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent," sources used to determine the ordinary and customary meaning of a claim term include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314.

Importantly, the claims "must be read in view of the specification, of which they are a part." *Id. at* 1315. The specification is "always highly relevant to the claim construction process. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* Further, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1324 (Fed. Cir. 2003).

## B.  Indefiniteness

"A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). Valid patent claims must "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. ¶ 2. "[T]he patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention… Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). Plaintiff's discussion of the law of indefiniteness fails to mention the clear and settled Federal Circuit precedent that is fatal to several of the

4

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

disputed claim terms and thus their assertion against B. Braun: ***"When a word of degree
is used the district court must determine whether the patent's specification provides
some standard for measuring that degree."*** *Datamize*, 417 F.3d at 1351.

## III.  ARGUMENT

### A.  Most Significant" Disputed Claim Constructions of the '418 Patent

#### 1.  *Plug* is a *member* moveable between an open and closed position

Plaintiff argues that B. Braun proposes a claim construction that is "inconsistent"
(without explaining how) with the Federal Circuit's construction of the claim term
"plug". B. Braun does nothing of the sort. Rather, B. Braun merely requests clarification
of the meaning of the term "member" that is used in the Federal Circuit's construction.
This is important for two reasons. First and foremost, clarification of the word "member"
(and thereby "plug") would be dispositive of the invalidity and non-infringement of
several claims -- i.e., if this Court finds that it includes, consistent with the scope it is
clearly given in the '418 patent claims and specification, the entire valve element (the
proximal and distal portions), including any collapsible skirt portion. (See Ex. 3, *e.g.*,
claim 56, "wherein the plug includes a collapsible skirt defining the air chamber within
the collapsible skirt"; claims 65, 73; col. 7, ll. 19-20 "a plug collapsible skirt 371, which
is preferably integrally formed with the plug 314") It also makes sense, particularly
when those upper/lower portions are both part of an integral structure that moves together
- which is precisely why Plaintiff opposes the clarification, but does not propose a
construction in its opening brief, or acknowledge that its interpretation of this term runs
counter to the intrinsic evidence.[5]

Clarification of "member" is also particularly appropriate in this case in view of
the apparently circular construction of another claim term "biased *member*" to mean "a
biased plug". When B. Braun asked CareFusion 303 what the terms "plug" and

---

[5] In Plaintiff's expert infringement report, CareFusion 303 takes the position that the "proximal
portion" of the valve element is the "plug" (and/or "member"). (*See* Ex. 9 at, *e.g.*, ¶¶ 183, 253.)

"member" meant during their meet-and-confer, Plaintiff once again took its evasive "plain and ordinary" meaning approach of it means-what-it-means.  That sort of tactical avoidance flouts the entire purpose of the claim construction (and meet-and-confer) process of resolving issues so that the jury is not left to deal with it.  *O2 Micro,* 521 F.3d at 1360.

B. Braun's requested clarification of a prior construction is entirely appropriate under the law, *see Telecordia Techs., Inc. v. Cisco Sys., Inc.,* 612 F.3d 1368, 1373-74 (Fed. Cir. 2010) (allowing argument for more precise construction), and necessaryt o resolve this dispositive and disputed issue.

## 2.    *minimum* displacement of fluid and *minimum* fluid displacement

The terms "*minimum displacement of fluid*" and "*minimum fluid displacement,*" as used in Claims 31, 32 and 68, are indefinite under 35 U.S.C. § 112, ¶ 2 because of their fatally indeterminate and subjective terminology.  *No objective standard* is discernible from the specification that would provide a person of ordinary skill in the field with any way of   measuring or knowing whether a particular amount of fluid displacement is "minimum."[6]   Months ago, B. Braun made this position clear in its March 28, 2012 Invalidity Contentions (Ex. 10 at 35-37), yet Plaintiff still cannot point to any such objective standard in the specification -- because none exists.[7]  Accordingly, based on the fatally imprecise language of the claim, the absence of any objective standard for "minimum" fluid displacement in the specification, and Plaintiff's failure to address the

---

[6] The purpose of Section 112 definiteness is to inform the public so that they **know exactly** what the claim covers (and what it does not).  *Datamize,* 417 F.3d at 1347. In this case, neither B. Braun nor any other competitor has any way of knowing how to design a valve that would avoid infringement by providing more than the claimed "minimum" positive fluid displacement. *See Halliburton,* 514 F.3d at 1249 (if "competitors cannot avoid infringement" due to imprecise claim scope, this would "defeat[] the public notice function of patent claims.")

[7] Contrary to CareFusion 303's misleading argument, B. Braun's infringement expert, Dr. Kytomaa, made clear that he was merely applying CareFusion 303's proposed construction while expressly declining to opine that it was in any way correct. (Ex. 12 at ¶¶ 179, 195-196.)

6

issue in its opening brief,[8] these claim terms should be found to be indefinite. *Datamize*, 417 F.3d at 1351.

**Rebuttal to Plaintiff's Construction:** In its brief, Plaintiff purports to rely on Judge Pfaelzer's prior (and non-final) construction of this term as *"zero or close to zero as possible,"* in *Medegen I* (not the Federal Circuit). But this prior construction and Plaintiff's subsequent actions serve only to confirm indefiniteness. Indeed, the construction of "as close to zero as possible" is just as indefinite as "minimal fluid displacement", and just as lacking in any objective standard in the patent that would enable a person of ordinary skill in the field to determine what amount would of displacement would meet it.[9] It is also <u>not</u> the construction that Plaintiff and its counsel actually applied in its Rule 11 pre-suit infringement analysis, or its Infringement Contentions which per this Court's clear directive were to be as "specific as possible" and may not be modified "only by order of the Court." (Dkt. 30.)[10] Indeed, Plaintiff swore "under oath" to Magistrate Nakazato that it had "completed" its pre-suit analysis and "confirmed" infringement (Dkt. 87 at 4-5), and its Rule 30(b)(6) designee who conducted that analysis with counsel (George Mansour, CareFusion 303's head of R&D) testified that ███████████████████████████████████████████

---

[8] All that Plaintiff says is that the specification teaches that fluid displacement can "vary substantially, based upon device design, materials, and the tolerances allowed for both male and female Luers." (CF's Br. at 6; '418 col. 2, ll. 12-15). If anything, this supports the indefiniteness of the claim term.

[9] CareFusion 303 misapplies the law of collateral estoppel. Any collateral estoppel effect of *Medegen I* is non-mutual - B. Braun (or this Court) is not required to accept Judge Pfaelzer's claim construction. *See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 349-350, 91 S.Ct. 1434, 28 L. Ed. 2d 788 (1971). On this, it also does not appear that Judge Pfaelzer considered, or was asked to consider, whether the specification provided an objective standard for determining "minimum" as required by law. *See Datamize*, 417 F.3d at 1351.

[10] As part of the Rule 11 duties to conduct a reasonable pre-suit inquiry, an attorney/party must "interpret the pertinent claims of the patent in issue before filing a complaint alleging patent infringement." *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 2007 WL 6137003, at *14 (C.D. Cal. Apr. 16, 2007), *aff'd*, 558 F.3d 1368 (Fed. Cir. 2009). Unreasonable infringement allegations based on a frivolous construction of claim terms will warrant sanctions. *Id.* at *14-16.

7

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

CareFusion 303's Infringement Contentions took this same approach. (Ex. 11, Ex. B at 3-6, 8-12, 19-22) (Dkt. 46). Thus, it is Plaintiff, not B. Braun, that has read out the term "minimum." And, last but not least, ***even after being sanctioned*** by Magistrate Nakazato for its deficient interrogatory responses, Plaintiff never supplemented them to include a construction for this "minimum fluid displacement" term, or numerous of the other disputed terms at-issue, choosing instead more of the same "unjustified litigation tactics," "defiance" of unmistakably clear court orders and "absolutely inexcusable," "evasive' and "frivolous" discovery responses. (Dkt. 87, Sanctions Order at 8, 10-13.) Standing along, this continued bad faith behavior warrants the sanction of preclusion that Magistrate Nakazato referred to Your Honor. (*Id.* at 6 n.2.)

B. Braun respectfully submits that Plaintiff's proposed construction should be rejected and the "minimal" fluid displacement limitations of claims 31, 32 and 68 ruled indefinite as a matter of law. To the extent your Honor believes that this term can and should be construed, B. Braun believes that CareFusion 303 should be bound by the construction it applied in its Infringement Contentions and Rule 11 "analysis", i.e., that any amount of displacement meets this limitation.

### 3. *relatively small* movement of fluid

For all of the same reasons set forth immediately above, the claim term "*relatively small movement of fluid*," as used in Claims 27-28, is also indefinite. As with "minimum fluid displacement," the term "relatively small" is a term of degree and there is no objective standard in the patent that would allow a person of ordinary skill to determine

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
LA 130,338,221v1

whether a particular amount of fluid movement is "relatively small" or not. *Datamize*, 417 F.3d at 1351.

The fact is, not even the inventors of the '418 patent could say what it means or how one would determine whether it is met:

[redacted]

[11]

Judge Pfaelzer also recognized it:

"The use of the term 'relatively small' immediately raises the question of, 'relative to what?' ***Because the term is not found in the specification and is not defined in the claims, the answer is ambiguous.*** The word 'relatively' appears unnecessary given that ***no meaningful comparison of fluid flow volume is made in the specification or claims.***"

Claim Construction Order, *Medegen MMS, Inc. v. ICU Med., Inc.*, No. SA CV 06-619 MRP at 26 (June 21, 2007) (Ex. 13.) ("*Medegen I*")  Per this finding, this claim term should have been declared indefinite if the court had then applied the appropriate legal standard.  *See Datamize*, 417 F.3d at 1351; *Halliburton*, 514 F.3d at 1249; *see also United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942) (words of degree "comparatively small" are indefinite).  B. Braun respectfully submits that it should be applied here.

Finally, in further testament to the indefiniteness of this term, Plaintiff itself did not apply its proposed construction when analyzing and "confirming" infringement before suit or in its Infringement Contentions.  Instead, just like with "minimum fluid displacement," [redacted]

[11] [redacted]

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

LA 130,338,221v1

*See* Section III.A.2., *supra*.   Plaintiff should be precluded from changing its Infringement Contentions and underlying claim construction now and its current proposal should also be rejected based on how it differs from its Infringement Contentions.[12]   And, to the extent this Court finds the claim term "relatively small" to be definite, B. Braun proposes the construction "an amount of displacement of fluid," which comports with the only construction applied by CareFusion 303 in its prior infringement analyses.

### 4.   internal chamber

"*Internal chamber*" should be construed to mean the "*internal portion of the housing in between and not including the valve throat and the valve base*."   This construction is consistent with the language of the claims and the patent specification's explicit definition of "internal chamber."

The '418 patent describes the boundaries of the internal chamber in relation to the valve throat and valve base.   The housing (not the internal chamber) of the '418 connector is comprised of a "valve cap" and a "valve base." (col. 5, ll. 11-13; Fig. 1).   In its brief, CareFusion 303 asserts that the patent says the valve base and valve cap "*together* form an internal chamber", citing to col. 5, lines 18-19 of the specification. (See CF's Br. at 9, ll. 1-2.)   The patent says nothing of the sort.   To the contrary, it specifically defines the internal chamber as being "formed *between* the valve base 18 and the valve cap 16[.]" (col. 5, ll. 18-19) (emphasis added).

---

[12]   CareFusion 303 should also be collaterally estopped from changing the construction in *Medegen I* to add "less than" ("movement of a volume of fluid that is more than zero and is approximately equal to the volume of the actuator tip"). *See Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 732 F. Supp. 2d 1082, 1090 (S.D. Cal. 2010) (citing *In re Freeman*, 30 F.3d 1459, 1465-69 (Fed. Cir. 1994)); *Curtiss-Wright Flow Control Corp. v. Z & J Techs. GmbH*, 563 F. Supp. 2d 1109, 1121-22 (C.D. Cal. 2007).   Plaintiff's ability to "further refine" this term to its liking was foreclosed when Medegen settled its litigation with ICU, ending all "future proceedings". *Int'l Gamco*, 732 F. Supp. 2d at 1091 ("Under Ninth Circuit law, a court approved settlement is a final judgment on the merits for purposes of collateral estoppel.") (citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006).

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

LA 130,338,221v1

Thus, the internal chamber does not include the "valve cap" or any of the three regions -- a "valve inlet port," a "valve throat," and a "valve seat" -- that comprise it. (col. 5, ll. 13-16; Fig. 1). This is further confirmed by the patent's clear descriptions of the valve throat and internal chamber as separate and distinct areas including in describing how the actuator is introduced "*through* the valve throat and *into* the valve internal chamber 38" (col. 6, ll. 31-32) and how, on removal of the actuator, "a negative fluid displacement is generated *within the valve internal chamber 38 and the valve throat 23*.") (col. 6, ll. 57-58.)

In contrast, CareFusion 303's proposed construction, *"the volume of the valve that is in contact with the fluid"* is wholly unsupported by the above, or any other descriptions in the specification, as well as the clearly differentiated language of the patent claims. Indeed, the claims themselves also exclude the valve throat from the valve internal chamber. Compare, for example, Claims 1, 7, 28-30, 48, 52, 59, 60, 68 and 69 (referring to the insertion of the actuator "into the valve inlet port") with Claims 9, 16, 17, 19, 23 24, 27, 32, 40, 47, 53, 61, 65, and 73 (referring insertion of the actuator "into the internal chamber.") This deliberate difference in language indicates that insertion of the actuator into the valve inlet port, so as to open the valve, is not the same as insertion of the actuator into the internal chamber. *See Tandon Corp. v. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims."). Finally, the dictionary definitions selectively quoted by Plaintiff have nothing to do with a "volume…in contact with the fluid," fail to support CareFusion 303's own proposed construction, and cannot be used to controvert the clear intrinsic evidence. *Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1374 (Fed. Cir. 2012) (holding district court "erroneously construed 'perforated' using extrinsic evidence that contradicts the intrinsic evidence of record.").

### 5.    "substantially compensates … for a zero displacement"

11

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

LA 130,338,221v1

In perhaps the most blatant of Plaintiff's attempts to divorce a disputed term from the surrounding language of the claim, CareFusion 303 attempts to construe *"substantially compensates"* in isolation from and without regard to the latter part of the limitation which indicates exactly what the end result of such substantial compensation is, i.e., "*... for a zero displacement within the internal chamber.*"[13]   Accordingly, based on the clear language of the claim 17 itself, this term should be construed to mean: "*is equal to, such that the net displacement is zero.*"

The '418 patent makes clear that it is directed to several types of medical connectors: (1) a "displacement free medical connector"; (2) a "minimum fluid displacement medical connector"; and (3) a "self-flushing medical connector."   (Ex. 2, col. 2, ll. 25-30.)   Based on Claim 17's requirement of "zero displacement within the internal chamber," it covers the first of these types of connectors -- a "displacement free medical connector", i.e., a connector wherein the initial fluid displacement due to Luer insertion is equal to the counter-acting fluid displacement caused by Luer removal so that the net displacement is zero (or neutral). (*Compare* Ex. 3, Claim 31 (changing "offset" to "*over*compensate" on reexamination)).

CareFusion 303 completely ignores this indisputable intrinsic evidence and does not propose any alternative meaning for this term, electing instead to assert that the "plain and ordinary meaning" of the term should be applied and that "no construction is required."   This is not good enough in view of the dispute over the scope of this claim phrase, which requires that its meaning and scope be resolved by the Court as a matter of law. *See O2 Micro*, 521 F.3d at 1360. Plaintiff fully understood why the construction of this term would be dispositive (i.e., none of the accused products are zero/neutral displacement and thus would not infringe), and its naked assertion of "plain and ordinary" meaning did nothing to help inform that decision.   CareFusion 303 should be

---

[13] Notably, Plaintiff removed this claim language from its brief which the parties had agreed in the Joint Claim Construction Statement should be part of the disputed term. (*See* Dkt. 238 at 21.)

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

LA 130,338,221v1

1  precluded from proposing a construction in its Reply or otherwise and B. Braun's

2  construction should be adopted and applied consistent with the language of the Claim 17.

3       **B.**     **"Most Significant" Disputed Claim Constructions of the '816 Patent**

4       **1.**     **valve element … displaced *off-axis* … to form a fluid channel**

5       Here again, Plaintiff seeks to divorce the disputed term "***off-axis***" from the rest of

6  the claim language and, specifically, the language which makes clear that the off-axis

7  displacement is for the purpose of ***forming*** or ***opening*** the fluid channel.   The patent

8  disclosures are clear and indisputable -- the ***only*** way that the valve elements of the

9  alleged invention "form" or "open" the fluid channel is by the ***tilting*** of the proximal end

10  (top) surface. (*See, e.g.,* Ex. 3, Figs. 3, 5 and 11.)  Thus, contrary to Plaintiff's assertion

11  (CF's Br. at 12), there is nothing at all "inconsistent" with B. Braun's proposed

12  construction of this term to mean "***such that the second axis tilts so as to not coincide***

13  ***with the axis of the housing when the valve element is in the second position***."

14       B. Braun has been consistent in its position that the alleged invention of the '816

15  patent is a valve element with a top surface that "displaces" or cants *so that* the surface

16  tilts at an angle to allow fluid to exit the male Luer in the space between the top surface

17  and the Luer opening that is created by the tilting.[14]

18       The disclosures of the patent are likewise consistent.  (Ex. 5, at abstract ("axially

19  compresses the valve element to a canted position thereby permitting medicinal access

20  through the channel"); col. 2, ll. 16-21 ("In the second position, the valve element is

21  canted off axis to open the channel … a fluid path occurs along the channel between the

22  top surface of the valve element and the interior of the housing."); col. 5, ll. 35-44 ("The

23

---

24  [14] While the term "tilts" is not in the specification itself, it reflects a more easily understandable
25  term for a jury than the archaic word "cants".  *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616
F.3d 1357, 1366 (Fed. Cir. 2010) (approving of construction that "aids the court and the jury in
26  understanding the term as it is used in the claimed invention.").  Again, the important point is
that the top surface of the valve element changes angle to break the "face seal" between it and
27  the male Luer, such that fluid can flow through it, and the term "off-axis" should be construed to
28  define whatever relationship with the axis that allows this to happen.

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

LA 130,338,221v1

valve element 90 is of *particular interest to the present invention….* the closed stated is illustrated in Fig. 2 where the proximal surface 110 has a first angle (such as 90 degrees) to the axis 36; the open state is illustrated in Fig. 3 where the proximal surface 110 has a second angle (less than the first angle) to the axis 36.");  *see also* col. 6, ll. 10-16 and 26-47,  col. 7, ll. 34-43; col. 8, ll. 7-11 and 47-56; col. 9, ll. 9-18 and 65-67.)

For the entirety of this lawsuit, CareFusion 303 has always attempted to mask its proposed construction, hiding behind the allegedly "plain and ordinary meaning" of "off-axis". (Ex. 9, at 5-6; Ex. 16, at 5.)  It was only shortly before the joint claim construction statement was to be filed and the day after Plaintiff refused to explain what that "plain and ordinary" meaning was during the parties' meet and confer that CareFusion 303 disclosed for the first time its construction of "off-axis" as "off the axis of the housing". (MacLean Decl. ¶ 29.)  In B. Braun's view, it does not matter whether displacement or compression "off-axis" refers to the axis of the valve element or the axis of the housing. Rather, the point is the term "off-axis" should be construed in a manner consistent with what the patentee described as its invention. *Chimie v. PPG Indus. Inc.,* 402 F.3d 1371, 1379 (Fed. Cir. 2005).  On this, the facts are clear and undeniable, the patent teaches *no way* to "form" or "open" the channel as required by the claim language (that Plaintiff ignores) other than by tilting of the proximal surface.  As such, the term "off-axis" should be construed to carry-out and reflect the invention as disclosed and claimed, as B. Braun has proposed. *Id.*[15]

## 2.    second axis … displaced … to form/open a fluid channel

Just like with "off-axis," Plaintiff seeks to construe the claim term "*second axis*" in isolation from the rest of the claim language.  In particular, CareFusion 303 ignores the

---

[15] The use of the terms "axis" and "displaced" in Claim 6 are similar to the use of the phrase "second *axis … displaced* from the first *axis*" in Claim 1, and thus as set forth in the next section, B. Braun believes that they should be construed similarly.  *See Phillips,* 415 F.3d at 1314 ("[T]he usage of a term in one claim can often illuminate the meaning of the same term in other claims.") For this reason, B. Braun believes that reference to the "second axis" (defined below) in its construction is proper.

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

requirement that the claimed purpose of the axis displacement is to *"form"* or *"open"* the fluid channel. B. Braun properly accounts for this in its proposed construction of: "the line extending through and perpendicular to the proximal surface of the housing that tilts so as to not coincide with the axis of the housing when moved into the second position."

As explained above in connection with the similar "off-axis" claim term, B. Braun's proposed construction is consistent with what the '816 patent describes as the invention, and the intrinsic record. (Ex. 5, abstract; col. 2, ll. 16-21; col. 5, ll. 35-44; col. 6, ll. 10-16 and 26-47, col. 7, ll. 34-43; col. 8, ll. 7-11 and 47-56; col. 9, ll. 9-18 and 65-67.) The intrinsic *and* extrinsic evidence relied on by both parties is clear that an "axis" is a straight line. (*Id.; see also* Exs. 24-26; Decl. of Scott P. McBride, Exs. 8-9.) However, in the second position, the valve element "cants" or bends into a curved position so that the proximal surface can tilt to form/open the fluid channel, such that there is no straight line through the entire valve element. (Ex. 5, at Figs. 3, 5, and 11.) However, it is clear that the patent contemplates that a "second axis" exist when the valve element is in its second curved/tilted position. (*E.g.*, Ex. 5, claim 1.) Therefore, one of skill in the art must pick a straight line through *some portion* of the valve element that, in the second position, achieves the object of the invention of the surface tilting to form or open the fluid channel. This line would, thus, be the line through the proximal surface, which tilts so as to not coincide with the axis of the housing.

CareFusion 303's construction, on the other hand, is contradicted by the specification. For instance, CareFusion 303 takes the position that the "second axis" must be an axis of the entire valve element, but as stated above, in the "open" second position this would be impossible because there is no straight line that can run through the curved valve element. CareFusion 303's position is also belied by Fig. 2 and its corresponding description in the specification (Ex. 5, col. 5, ll. 12-24), which clearly describes *two* axes going through the valve, one being the axis of the "plug" (top portion) and one being the axis of the "shaft" (remainder). (*See also id.* Fig. 10 and col. 8, ll. 47-

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

51 (depicting a "plug" that is "coaxial with the housing" but a "shaft" that is "non-aligned with the axis of the housing").   Also, the valve elements in nearly all embodiments have a notch in the proximal (top) portion of the valve element that would shift the "center line" at that point, and Fig. 13 has notches in the shaft of the valve element.  (*See id.* Figs. 2-13.)  If CareFusion 303's construction of "center line" were correct, the "second axis" would be depicted so as to curve or shift to the "center" of the valve element at that point.  But the patent depicts all axes as straight lines (even where the center point of the valve element shifts), so CareFusion 303's position must be incorrect. (*See id.* Figs. 2-13.)

### 3.   fluid channel being non-concentric with the axis of the housing"

### and

### 4.   "fluid flow path is displaced from the axis of the housing"

B. Braun proposes that both of these claim terms be construed to mean "*for most of the length of the fluid channel, the fluid flow is not centered around the axis of the housing.*"  Once again, CareFusion 303 tries to dodge the construction of these two terms by arguing that they should be accorded "plain and ordinary meaning."  But, as belied by their "alternative" construction (i.e., "for at least some of its length"), the parties clearly have a dispute over the scope of this claim language, i.e., what the "plain and ordinary meaning" of these terms actually mean.  As such, construction by the Court is required. *See O2 Micro*, 521 F.3d at 1360.

B. Braun's construction is supported by the intrinsic evidence.   Contrary to CareFusion 303's arguments, the "for most of the length" language is required to conform to the specification and prosecution history.  Claim 15 contrasts the position of the fluid flow path in the first position, which is "concentric with the axis of the housing," to the second position, which is "displaced from the axis of the housing." Therefore, displaced in this sense must mean "not concentric."  Since the terms "fluid flow path being non-concentric with the housing" and "fluid flow path is displaced from

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

LA 130,338,221v1

the axis of the housing" never appear in the patent specification, one must resort to the drawings to determine the meaning of this claim language. These patent drawings show, for example, that when the valve element is in the first position, there exist notches, "fingers," and other structures whereby the fluid channel, or flow path, is not *perfectly* centered around the axis of the housing. (*See, e.g., id.* Figs. 2, 4, and 13.) Therefore, because "concentric" does not require the centers of the flow path/channel and the axis of the housing to be centered along the entire length, "non-concentric" or "displaced" must mean that the centers of the flow path/channel and the axis of the housing must not be centered *for most* of that length.

The prosecution history fully supports this construction. The language in Claim 6 and 15 was added to overcome the PTO's rejection as anticipated by U.S. Patent No. 5,509,433, to Paradis ("Paradis", Ex. 17). The '816 patentee described the Paradis valve as "compress[ing] axially so that the flow channel remains concentric with the axis of the housing in the second position." (Ex. 23 at CFCCA00000201.) However, the Paradis valve also shows some points where the fluid flow is not perfectly centered around the axis of the housing for "at least some of its length". (*See* Ex. 17, col. 6, l. 65 - col. 7, l. 1; Figs. 4A, C, item 46-s ("upper slot"); col. 6, ll. 53-55 ("The flexible body 47 of the moveable plug 46 is expandable *laterally* with respect to the axis") (emphasis added); *compare* Ex. 5, col. 4, ll. 58-62 ("In the embodiment of Fig. 2, the base 30 is formed as a plurality of *concentric* cylinders 74, 76, and 78 which are stacked along an axis 81 that is *concentric* with the axis 36 in this embodiment."). Accordingly, Plaintiff's "alternative" construction cannot be correct in view of the prior art and the file history.

B. Braun respectfully submits that its proposed construction should be adopted.

**5.    open the channel substantially along only one side of the housing**

The phrase *"open the channel substantially along only one side of the housing,"* as used in Claim 17, cannot be construed and thus renders this claim indefinite. The term

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

LA 130,338,221v1

"substantially" is a term of degree, but there is no objective standard in the specification for measuring that degree so the claim is invalid *Datamize*, 417 F.3d at 1351.

First of all, the term "open the channel substantially along only one side of the housing" is nowhere to be found in the specification, and so, there is also no objective standard for determining its meaning and scope. This language was added to Claim 17 to overcome a rejection of the original claim as anticipated by Paradis but the prosecution history likewise gives no indication of what it means to "open the channel *substantially* along only one side of the housing," as opposed to "minimally" along only one side of the housing or some other lesser or greater amount. (Ex. 23, at CFCCA00000197, 201).

True to form, CareFusion 303 ducks proposing a claim construction for this fatally indefinite term by once again nakedly asserting "plain and ordinary" meaning.  In its brief, Plaintiff cites to nothing from the claims, specification, or prosecution history. It does, however, give a dictionary definition for one word - "side". The problem with this term in the context of the '816 patent (and B. Braun's accused valve), is that circular-shaped valve interiors have an *infinite number* of "sides." Thus, there is no way to tell what portion of the channel must be open along which "side" of the housing in order to meet this claim. For this additional reason, the claim is incapable of construction and is indefinite. *Datamize*, 417 F.3d at 1351.[16]

## C. <u>Other Disputed Claim Constructions of the '418 Patent</u>

### 1. biased member/plug...moved ... into a portion of the air chamber

The term "*moved...into* a portion of the air chamber" as used in claims 17, 27, and 68 should be construed to mean "*moved to the inside of*" that air chamber.

B. Braun's proposed construction of "moved into a portion of the air chamber" fully comports with the intrinsic evidence. CareFusion 303 disingenuously suggests that

---

[16] Alternatively, if this Court should find the term to be definite, B. Braun proposes the construction "a significant majority of the volume of the channel is on one side of the housing when the valve is open" so as to give some meaning to "substantially." See *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

18

LA 130,338,221v1

the plain and ordinary meaning of "moved into" has nothing to do with "movement into" but rather has to do with the "resultant displacement of air due to movement of the plug." (CF Br. at 18.)  However, the claims and specification clearly indicate that there is more than one way for this to occur.  In one embodiment (Ex. 1, Figs. 1 and 2), an "air chamber" is formed within a "valve distal cylinder," and the plug "is moved into the vented air chamber" on insertion of the actuator.  (Ex. 1, col. 5, ll. 11-13; col. 5, ll. 16-20; 5, ll. 23-44 and 61-65; col. 5, line 66 – col. 6, line 22; col. 6, ll. 31-34; col. 6, ll. 39-55; Figs. 1-2.)  In a separate embodiment, however, "the plug cylindrical distal portion [is] eliminated."  (Ex. 2, col. 2, ll. 17-19.)  Instead, the air chamber is formed within a "plug collapsible skirt," and insertion of the actuator results in the collapsing of the plug collapsible skirt, *not* moving the plug "into" the air chamber.  (*Id.* col. 2, ll. 24-31; '418 patent, FIG. 3).  On reexamination, the patentee added language to the specification, specifically indicating that the collapsible skirt embodiment of FIG. 3 stood "[i]n *contrast* to the embodiment illustrated in FIGS. 1 and 2."  (*Id.* col. 2, ll. 11-12) (emphasis added).  Thus, the patentee clearly indicated that collapsing a collapsible skirt is not equivalent to "moving" the plug "into" the air chamber.  *Omega Eng'g*, 334 F.3d at 1324.

The claims themselves also support B. Braun's position.  Some claims of the '418 patent contain the limitation that movement of the actuator "collaps[es] the collapsible skirt" and *not* the limitation that the plug be "adapted for moving into the air chamber." *See., e.g.*, '418 patent, claims 65, 73.  This would indicate that merely collapsing the collapsible skirt would not suffice to "move" the plug "into the air chamber." CareFusion 303's citation to other language in the specification teaching that "movement of the actuator into the internal chamber collapses the collapsible skirt *and* moves the biased member into a portion of the air chamber," ('418 col. 3, ll. 10-15) (emphasis added), actually supports B. Braun's position that collapsing of the collapsible skirt is not the same thing as movement "into" the air chamber.  If it were, this language would be redundant. *Merck*, 395 F.3d at 1372.  While CareFusion 303 may be correct that in some

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

configurations of the '418 connector, a plug can move into the air chamber and collapse a collapsible skirt at the same time, this is not the embodiment depicted by Fig. 3, as made clear on reexamination.  (Ex. 2, col. 2, ll. 9-34.)

Finally, the prosecution history fully supports B. Braun's position.  The patentee distinguished the invention disclosed in the '418 patent from that disclosed in B. Braun's U.S. Patent No. 5,439,451 to Collinson ("Collinson" or the "'451 patent") (Ex. 18).  In the request for reexamination, the patentee repeatedly argued that the '451 patent "does not disclose a plug that moves into an air chamber[.]"  (*See* Ex. 20, at CFCCA00001190-1191.)  The patentee continued this line of argument after reexamination was granted, arguing that "[in] Collinson et al., the distal cylinder of the valve housing 10 does not define an air chamber, but rather a fluid pathway, or internal chamber.  The air chamber in Collinson et al. is defined instead by the collapsible valve member 30."  (*See id*. at CFCCA00001303-1304.)   In doing so, Plaintiff disclaimed from its scope the embodiments of the Collinson patent which use the same piston and collapsible skirt as the Accused Products.

CareFusion 303's proposed adoption of the "plain and ordinary meaning" of this disputed phrase, without making any effort to define its meaning and scope to a person of ordinary skill in the art, is once again decidedly unhelpful.  In support of its "plain and ordinary meaning," CareFusion 303 cites to the *fifth* and *seventh* listed definitions from one dictionary, and the *third* and *fourth* listed definitions from another - while conveniently ignoring the *first definition* that is given in each of those dictionaries: "*To the inside or interior of*."  Either CareFusion 303 completely missed the fact that this first-listed definition is B. Braun's proposed construction -- or, more likely, was hoping that B. Braun and the Court would miss it.  We did not.  Accordingly, the intrinsic evidence, including Plaintiff's disclaimers during reexamination, as well as Plaintiff's own dictionary definitions, fully support B. Braun's construction.

   2.    **"generally planar"**

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

LA 130,338,221v1

The term "*generally planar*," as used in Claims 17 and 32, cannot be construed and thus renders those claims indefinite.   Specifically, while "generally" is a subjective term of degree, there is *no objective standard*, discernible from the specification, that provides any way to measure whether a particular surface is "generally" planar. *Datamize*, 417 F.3d at 1351.  Heightening the ambiguity is the fact that Claims 39-40 recite a "planar" surface, rather than a "generally planar" surface.  Thus, Claims 17 and 32 must encompass something that Claims 39-40 do not, i.e., a valve element with a surface that is not entirely planar.  There is no discernible way to tell how far away from "planar" one can get in order to meet, or avoid meeting, the "generally planar" limitation.[17]

When asked about this claim language on the parties' meet-and-confer, CareFusion 303 could not propose a construction other than the "plain and ordinary meaning."  That is because it is not possible to propose a construction.  CareFusion 303's citations to B. Braun patents and case law holding that "generally parallel," "generally flat" and the like are inapposite, because, aside from some standard for measuring "generally" in the specification, those cases do not deal with differing claims, some with the word of degree and some without.

Because CareFusion opaquely proposed the "plain and ordinary meaning" without explaining what it believed the "plain and ordinary meaning" to be -- i.e., how far away from "planar" one can get in order to not be "generally planar" -- it should treated as if it proposed no construction at all and not be permitted to do so for the first time on reply.

3.    **"non-perpendicular relationship" and "slanted relationship"**

---

[17] The dispute over this term did not come about until receipt of Mr. Leinsing's Invalidity Rebuttal Report on May 21, 2012.  Prior to that, B. Braun did not believe there was any dispute over the term, and in its Invalidity Contentions and the Expert Report of Terry Layton, identified prior art references with what it believed were "generally planar surfaces" as that term was used in the '418 patent.  (Ex. 10, at 23-24; Ex. 22, at 32-35.)  However, in Mr. Leinsing's Report, he disagreed that those surfaces were "generally planar" (Ex. 21, at 21-24), giving rise to the question of whether the claim language was definite.  As discussed herein, it is not.

CareFusion 303 fails to put these terms in context, because they define different relationships. Claims 17 and 40 require that the "planar" or "generally planar" surface of the plug or biased member be "*disposed in a non-perpendicular relationship* <u>*with the axis*</u>" when the valve is open. Claim 32 requires a "generally planar surface being *oriented in a slanted relationship* <u>*with respect to an end surface of the actuator*</u> when the actuator is inserted into the valve internal chamber." Both of these claim phrases were added during reexamination prosecution to avoid prior art, most notably the Mayer patent (Ex. 27). During prosecution, the patentee argued that in Mayer, the "*portion of* the proximal surface ... is neither non-perpendicular with the axis of the inlet port, nor slanted with respect to the end surface of the actuator." (Ex. 20, at CFCCA0001307) This indicates that, to meet these claim limitations, the *entire* surface -- and not just a "portion" thereof -- must be either not perpendicular to the axis (Claims 17, 40) or slanted with respect to the actuator (Claim 32). This position is further supported by the intrinsic record. (Ex. 1, col. 5, ll. 46-51; col. 6, ll. 3-16).

CareFusion 303 does not divulge its position, again asserting only a construction of "plain and ordinary meaning." But CareFusion 303's infringement analysis does not comport with even the dictionary definitions that it cited. (CF Br. at 20-21.) Instead, its expert opines that in the accused Caresite product, ██████████ ████████████████████████ and that was sufficient to meet the "non-perpendicular relationship" and "slanted relationship" limitations. (Ex. 9 at ¶¶ 383, 457, 475.) This is not an application of the "plain and ordinary meaning" of "perpendicular" or "slanted", but a genuine dispute about the scope of these claim terms. CareFusion 303 should not be allowed to argue about the scope of these terms to the jury; instead, this should be construed by the Court per *O2 Micro*. Having failed to engage in the Court-ordered process and to propose a construction, any attempt by Plaintiff to do so in its Reply should be rejected. We submit that B. Braun's proposed construction fully accords with the intrinsic record and should be adopted.

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

LA 130,338,221v1

### D.   Other Disputed Claim Constructions of the '816 Patent

#### 1.   shaft

The term "*shaft*" should be construed to mean "*a compressible section of the valve element supporting the plug and extending along the length of the valve.*"

This term first became an issue in the Rebuttal Report of Mr. Leinsing, where he opined that ████████████████████████████████████████████████████ ████████████████████████████████████ (Ex. 21, at 76) (emphasis added). This is the *epitome* of a claim construction-based argument, and yet CareFusion 303 continues to insist that this term be given its "plain and ordinary meaning" -- whatever that is.[18] CareFusion 303 should not be allowed to present this "fundamental disagreement over claim scope" to the jury, but instead, the Court is required to resolve this dispute as a matter of law per *O2 Micro*.

The intrinsic evidence supports B. Braun's, and not CareFusion 303's, position. The terms that CareFusion 303 suggests describe the shaft, including "sculpted," "generally hollow structure," "rounded configuration," and "seats ... within the arcuate spherical recess," and "formed integrally with the plug," (*see* Ex. 5, col. 3, l. 66-col. 4, l. 2; col. 9, ll. 29-34, col. 7, ll. 10-21, claim 23) are directed to particular embodiments of the invention, not the invention itself. They are also descriptive of a spring, and a spring would also satisfy the primary requirements of the *invention* in permitting the valve element to "compress[]... to a canted position" (*id.*, abstract; see also cl. 23 (with "characteristics for being axially compressed")), "disposed along the channel" (col. 2, ll. 11-13), and "supporting the plug" (cl. 11, 13, 15). Moreover, the fact that a valve element is sometimes described as having an "elastomeric" shaft indicates that the shaft

---

[18] Notably, CareFusion 303 does not cite a dictionary definition for "shaft." Also, CareFusion 303 and B. Braun did not "agree" that a shaft excludes a spring; indeed, CareFusion 303 has been on notice since B. Braun served its invalidity contentions and Dr. Layton's expert report that the spring of Mathieu constituted a "shaft." (Ex. 10 at 19 and Ex. H thereto at 26-28.) Rather, following the receipt of Mr. Leinsing's Rebuttal Report, B. Braun accepted his position solely for the purposes of its summary judgment motion, to avoid genuine disputes of fact.

may also be something that is not elastomeric. (col. 5, ll. 15-16, valve elements of the '816 patent "*may* be formed totally *or partially* of elastomeric materials[.]") *See Phillips*, 415 F.3d at 1314 (holding that the claim term "steel baffles ... strongly implies that the term 'baffles' does not inherently mean objects made of steel").

E.   <u>The Preambles of the '418 Patent Only Are Properly Limiting</u>

   1.   **The '816 patent preambles are not limiting**

The preambles in the asserted independent claims of the '816 patent fall squarely within the "general rule" that "preamble language is not limiting." *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1347 (Fed. Cir. 2012). Unlike the '418 patent, the preambles of the '816 patent claims do not "give life, meaning, and vitality" to the claim, but rather only "state a purpose or intended use" for the alleged invention. *See Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). The preambles state that the claims are directed to, *inter alia*, a connector "*adapted to* facilitate bi-directional flow between a male Luer fitting and a receptacle tube," "*adapted to* facilitate bi-directional flow between a male Luer fitting and an intravenous tube," "*adapted to* facilitate access into a receptacle," and "*adapted to* facilitate bi-directional flow with an intravenous tube," as well as "a *method for operating* a connector disposed between a male fitting and a receptacle." (Ex. 5, Claims 1, 6, 8, 15, 17.) This "adapted to" and other language are classic statements of intended use. *See, e.g., Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 868 (Fed. Cir. 1985), *overruled on other grounds by Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998) ("adapted to remain ... metal surfaces" in preamble held to be language of intended use); *Application of Hutchinson*, 154 F.2d 135, 138 (C.C.P.A. 1946) ("adapted for use" language in preamble "does not constitute a limitation in any patentable sense").

In his Expert Report on Infringement, CareFusion 303's expert agreed, opining that "*there is no reason to suggest that the preamble of claim [x] is a required*

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

LA 130,338,221v1

*limitation of the claim*".  *See* (Ex. 9 ¶¶ 99, 123, 151, 167, 191)  Based on this admission and the non-limiting language of the preambles, the general rule should apply to them.

### 2.    The '418 patent preambles are limiting

Unlike the preambles of the '816 patent, the preambles of the '418 patent *are* limiting.  First, these preambles were determined to be limiting in *Medegen I*.  *See Medegen I* at 20.  Thus, CareFusion 303 is collaterally estopped from arguing otherwise. *Int'l Gamco*, 732 F. Supp. 2d at 1091; *Curtiss-Wright*, 563 F. Supp. 2d at 1121-22.  As the *Medegen I* court noted, and is evident from the Title of the patent as well as the specification and prosecution history (including reexamination), the terms "minimum fluid displacement" (and, by implication, "self-flushing") describe the claimed invention itself, and thus "give life, meaning, and vitality" to the claim by default.  *See Chimie*, 402 F.3d at 1379 ("when the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment.").    Moreover, the patentee specifically relied on those preambles in distinguishing the B. Braun's prior art Collinson '451 patent, which covers the Ultrasite product.  (*See* Ex. 20, at CFCCA00001302-1303) ("Independent Claims 27, 28, 31, 45 and 61 are each *directed to a self-flushing connector*.  Thus, each of these independent claims recite a self-flushing feature....Collinson et al. simply provide no teaching of such a *self-flushing feature*.") (emphasis added).  Thus, these preambles must be construed as positive claim limitations.  *See Catalina*, 289 F.3d at 808 ("[C]lear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation").

## CONCLUSION

B. Braun respectfully requests that the Court adopt its proposed constructions.

Dated: June 21, 2012      **GREENBERG TRAURIG, LLP**

By:   */s/ Valerie W. Ho*

Valerie W. Ho, Attorneys for B. Braun Medical Inc.

B. BRAUN MEDICAL INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

LA 130,338,221v1